503 F.2d 29
 Howard KLARMAN, Petitioner and Third-Party Plaintiff-Appellee,
v.
Rose SANTINI, as Administratrix of the Estate of Aldo
Santini, Deceased andthe State of Connecticut,
Claimants-Appellants, v. TOWN OF WESTPORT andFrederick
Kellogg, Jr., Third-Party Defendants-Appellants-Appellees.
 Nos. 900, 901 and 999, Dockets 73-2757, 73-2808 and 73-2738.
 United States Court of Appeals, Second Circuit.
 Argued April 24, 1974.
Decided Sept. 3, 1974, Certiorari Denied Jan. 13, 1975, See
95 S.Ct. 785.
 
 1
 Chester A. Hahn, New York City (Schine, Julianelle, Karp, Gerety & Bozelko, Bridgeport, Conn., and Robert K. Killian, Atty. Gen. of the State of Connecticut, on the brief), for claimants-appellants.
 
 
 2
 Dion W. Moore, Bridgeport, Conn. (Frederick L. Comley, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., on the brief), for petitioner and third-party plaintiff-appellee.
 
 
 3
 Joseph T. Stearns, New York City (Robert K. Marzik, Stratford, Conn., Haight, Gardner, Poor & Havens, New York City, on the brief, Hollis M. Walker, Jr., New York City, of counsel) for third-party defendants-appellants-appellees.
 
 
 4
 Before LUMBARD and HAYS, Circuit Judges, and JAMESON, District Judge.*
 
 JAMESON, District Judge:
 
 5
 Rose Santini, as administratrix of the Estate of Aldo Santini, Deceased, and The State of Connecticut have appealed from a judgment denying them recovery of damages from Howard Klarman, Town of Westport and Frederick Kellogg, Jr., as the result of a boating accident on the navigable waters of the Saugatuck River in Connecticut on July 26, 1964, in which Aldo Santini was fatally injured. The Town of Westport and Kellogg have appealed from the denial of their indemnity claim against Klarman for counsel fees and expenses.
 
 The Accident
 
 6
 At about 4:30 P.M. on July 26, 1964 Klarman and several guests boarded the 28-foot Fling at Westport Harbor for a sail on Long Island Sound. Under power the Fling headed south along the main channel of the Saugatuck River. Near Buoy No. 13 off Bluff Point, it ran aground on the mud or sand bottom while being piloted by Klarman's brother-in-law. Klarman attempted unsuccessfully to back out of the strand by using the Fling's engine. A private motor cruiser was hailed and also tried unsuccessfully to free the Fling by towing from her bow.
 
 
 7
 At about 4:45 P.M. the Marine I arrived on the scene. The Marine I, a 26-foot launch powered by a 125 horse-power engine, was owned by the Town of Westport and operated as a patrol boat by its Police Department. It was under the command of Kellogg, a member of Westport Police Department.
 
 
 8
 Aldo Santini was aboard the Marine I as a volunteer member of the Westport Civil Defense, receiving on-the-job training as an auxiliary police officer.[1] This was his first and only time aboard the Marine I. Kellogg testified that Santini was not 'more or less permanently attached' to the Marine I, that the sole reason for his presence on the launch was to receive on-the-job training, and that he was not really 'supposed to do anything'. Kellogg normally operated the Marine I by himself, the only exception being when an auxiliary policeman was assigned to accompany him on patrol.
 
 
 9
 Klarman hailed Kellogg for assistance. Prior to rendering aid, Kellogg prepared and had Klarman sign an agreement by which he accepted 'full responsibility' for being towed and promised 'to pay for all damages which may occur'.
 
 
 10
 Thereafter, a line approximately 28 feet in length and one-half inch in diameter, with a bowline knot at one end and a back splice at the other, was passed from the Fling to the Marine I.[2] The bowline knot was placed over the Samson post in the bow of the Fling, and the other end was secured by Santini to a towing bar in the stern of the Marine I. The Marine I then attempted unsuccessfully to free the Fling by pulling for 15 to 20 seconds forward and to port at approximately a 45 degree angle to the bow of the Fling.
 
 
 11
 A second attempt, from the stern, was also unsuccessful. Klarman testified that he placed the bowline knot on a cleat at the Fling's stern, and ran the line through a chock on the starboard side of the taffrail.[3] Klarman then handed the other end of the rope to the Marine I, and again it was secured by Santini to the towbar. The Marine I commenced towing at a 40 degree angle to the Fling's port stern. Klarman noticed that the chock had loosened due to the stress of the tow, and accordingly called a halt to the second attempt.
 
 
 12
 On the third attempt Klarman secured the bowline knot by doubling it on the port-side Merriman winch, located near the stern of the Fling at the after-end of the cockpit. Klarman testified that the winch was primarily used to sheet the Genova sail and for mooring, but that on one prior occasion, in the summer of 1962, it was used as the point of attachment during a towing operation when the Fling had run 'aground in Watch Hill and (was) hauled off a ledge from the stern'.
 
 
 13
 The other end of the line remained fastened to the Marine I, and towing was resumed in an almost broadside direction. During this operation the winch tore loose from its pedestal and struck Santini in the head, knocking him overboard. Santini was rescued and taken to Norwalk Hospital, where he died on August 1, 1964.
 
 Proceedings in District Court
 
 14
 Klarman, owner of the Fling, filed a petition in admiralty seeking exoneration from or limitation of liability.[4] Rose Santini, as administratrix of her husband's estate, answered the petition and filed a claim against Klarman, contending that the death of her husband was due to Klarman's negligence and that he had the requisite privity and knowledge. The State of Connecticut also appeared as a claimant, seeking reimbursement for compensation benefits paid to the deceased's family under the Connecticut Workmen's Compensation Act.
 
 
 15
 Klarman was granted leave to implead the Town of Westport, owner of the Marine I, the other vessel involved in the accident, and Frederick Kellogg, Jr., commanding officer of the Marine I. Petition of Klarman, 270 F.Supp. 1001 (D.Conn.1967). Klarman's third-party complaint alleged on behalf of Mrs. Santini (1) a claim against the Town of Westport under the Jones Act, 46 U.S.C. 688 and the unseaworthiness of Marine I; and (2) a claim against Kellogg based upon his alleged negligence. On his own behalf Klarman claimed that he was entitled to indemnity or contribution for any damages which Mrs. Santini might recover against him.
 
 
 16
 At the trial Mrs. Santini moved to amend her answer to the limitation petition to assert a wrongful death action under Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970),[5] and to amend Klarman's third-party complaint so that the claims stated on her behalf would be in her own name and right. The Town of Westport moved to amend its third-party answer to include a counterclaim against Klarman for indemnity. Both motions were granted at the close of the trial.
 
 
 17
 As the district court stated, under a 'complex limitation proceeding in admiralty', Mrs. Santini in effect was 'suing Klarman, Westport and Kellogg as tortfeasors for the wrongful death of her husband', claiming he was killed as a result of their negligence 'and/or the unseaworthiness of the Fling and/or Marine I'. The principal areas of dispute in the non-jury trial concerned the propriety of the tow employed and the fitness and adequacy of the Merriam winch, its fastenings, and the towrope. On these issues the court heard testimony from Klarman, Kellogg and five experts-- three on behalf of Klarman (Blumen-stock, Atkins and Raymond), one on behalf of Kellogg and the Town of Westport (Love) and one on behalf of Santini (Prosser). The testimony of these witnesses was conflicting.
 
 
 18
 Following the trial, the district court in a detailed and well considered opinion based on its findings of fact concluded that:
 
 
 19
 (1) Aldo Santini was not a 'seaman' within the contemplation of the Jones Act;
 
 
 20
 (2) the defendants Kellogg, Klarman, and Town of Westport were not negligent;
 
 
 21
 (3) the Marine I was not unseaworthy;
 
 
 22
 (4) the Fling was unseaworthy;
 
 
 23
 (5) Santini was not within the class of persons protected by Klarman's warranty to provide a seaworthy vessel. The court therefore denied recovery to Mrs. Santini and The State of Connecticut and dismissed Klarman's third party complaint.
 
 
 24
 Kellogg and the Town of Westport moved to amend the findings to provide for recovery of attorney fees and expenses from Klarman. Prior to the court's decision on this motion, Kellogg and the Town of Westport filed their notice of appeal. The district court noted that 'such appeal ousts this Court from any jurisdiction to further consider third-party defendants' motion', but issued a brief memorandum indicating that it 'would have denied the motion'.
 
 
 25
 Mrs. Santini and The State of Connecticut have appealed from that portion of the judgment denying them relief against Klarman, Kellogg and the Town of Westport. Kellogg and the Town of Westport have cross-appealed from the portion of the judgment which in effect denied them indemnity from Klarman for attorney's fees and expenses.
 
 
 26
 Appeal of Mrs. Santini and The State of Connecticut
 
 
 27
 At the outset we note that many of the issues on this appeal involve the district court's resolution of disputed issues of fact. It is well settled that 'In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous', and that 'A finding is clearly erroneous when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed' * * *.' McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954). Although this court adheres to the rule that findings with respect to negligence and seaworthiness, as distinguished from the evidentiary facts upon which they are based, are not entitled to the benefit of the 'clearly erroneous' rule, we have held that 'such findings are entitled to great weight and will ordinarily stand unless the lower court manifests an incorrect conception of the applicable law'. In re Marine Sulphur Queen, 460 F.2d 89, 97-98 (2 Cir. 1972).
 
 Jones Act Claim
 
 28
 The district court's denial of recovery under the Jones Act rests upon its conclusion that Aldo Santini was not a 'seaman' within the meaning of the Act. As the court recognized, requirements for a Jones Act seaman are that 'the vessel must be in navigation, there must be a more or less permanent connection with the ship, and the worker must be aboard naturally and primarily as an aid to navigation'. Harney v. William M. Moore Building Corporation, 359 F.2d 649, 654 (2 Cir. 1966). While these requirements have not been interpreted strictly, they are not meaningless. Although the connection with the vessel 'may be less than permanent, * * * it cannot be temporary or transitory'. Bullis v. Twentieth Century Fox Film Corporation, 474 F.2d 392, 394 (9 Cir. 1973). Although 'aid to navigation' has been read 'very broadly', Harney, supra, 359 F.2d at 654, it is nevertheless required that an alleged seaman 'perform services upon ships and (be) exposed to the unique hazards of work upon the sea'. Mahramas v. American Export Isbrandtsen Lines, Inc., 475 F.2d 165, 170 (2 Cir. 1973).
 
 
 29
 The court concluded that Santini was not a seaman since his connection with the Marine I was temporary and he was not assigned to specific duties; that 'he was for all practical purposes really an observer and not a seaman'. Accordingly the court held that his widow had no claim under the Jones Act, 'even assuming that the Town of Westport was his employer'.[6]
 
 
 30
 Upon a review of the evidence we cannot say that the conclusion of the district court was legally erroneous or not supported by substantial evidence. Prior to the date of the accident Santini had never been aboard the Marine I, and there was no evidence that he would have been reassigned to the launch. It is true, as Mrs. Santini argues, that her husband was under the control of Kellogg, and that Kellogg testified that Santini had 'assisted in general' on the Marine I, had made fast the lines during docking, and had retrieved and secured the towlines to the Marine I during the first and second attempts to free the Fling. On the other hand, Kellogg also testified that Santini was not 'supposed to do anything', and that his sole purpose aboard the vessel was to receive on-the-job training in civil defense, that is, as Kellogg put it, 'He was assigned to be given instructions in the operation of the boat.' Although conflicting inferences may be drawn with respect to Santini's role on the Marine I, we cannot say that the district court erred in concluding, as it did, that Santini was not a seaman within the meaning of the Jones Act.
 
 
 31
 Negligence of Kellogg and Unseaworthiness of Marine I
 
 
 32
 Appellants specify 12 acts of alleged negligence by Kellogg and contend that 'Kellogg rendered the police launch unseaworthy by seeking to tow the Fling free with the conditions which then and there existed and which were activated by his own action'. The trial court held that Kellogg's 'conduct in attempting to free the Fling was in all respects proper, and that he exercised reasonable care and good seamanship in doing what he did to relieve the stranded sloop'. Our review of the evidence reveals little or no proof in support of many of the alleged acts of negligence. With respect to the remaining allegations, the evidence was conflicting. We, therefore, cannot say that the court's findings in favor of Kellogg and the Town of Westport were not without substantial evidentiary support or were clearly erroneous.[7]
 
 
 33
 Our conclusion that the district court was justified in finding that Kellogg's conduct was proper also disposes of appellants' contention that Kellogg's actions rendered the Marine I unseaworthy. Appellants suggest also that the inadequacy of the fastenings of the Fling's winch rendered the Marine I unseaworthy. It is clear, however, that the warranty of seaworthiness is owed by the shipowner only with respect to his 'vessel or its appurtenant appliances', Seas Shipping Co. v. Sieracki, 328 U.S. 85, 90, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and of course the winch was not an appliance of the Marine I. See also Mosley v. Cia. Mar. Adra, S.A., 314 F.2d 223, 228 (2 Cir. 1963).
 
 Klarman's Negligence
 
 34
 The district court stated that, 'The negligence charged to Klarman is a grapeshot of allegations but very little proof.' We cannot say that his findings that 'Klarman's conduct was not negligent in any respect' and that 'he acted in the manner of a reasonably prudent owner of a sloop that was grounded' are clearly erroneous.
 
 
 35
 Although the court held that the winch fastenings were inadequate, Klarman testified that he had no knowledge of the nature of the winch's fastenings. It was undisputed that the screws which secured the winch could only be examined following a removal of the winch drum.[8] Klarman testified that he had never removed the drum, and there was no convincing evidence that he should have done so. In addition, Klarman's testimony was uncontradicted that prior to the accident there was no external sign of any weakness in the winch fastenings, and that on one prior occasion the winch had been successfully used to tow the Fling off a sand bar.
 
 
 36
 It is true, as appellants argue, that there was expert testimony that the winch should not have been used as the sole point of contact for the towrope. On the other hand, there was also testimony from Raymond and Blumenstock that the port winch alone was a suitable object upon which to fasten the towline. The district court resolved 'the conflict between the experts' in Klarman's favor, and we are unable to perceive any error in its having done so.
 
 Unseaworthiness of the Fling
 
 37
 The district court found the Fling unseaworthy because of the inadequacy of the screws which secured the port winch. The court concluded, however, that Santini was not within the class of persons protected by Klarman's warranty to provide a seaworthy vessel. We agree.
 
 
 38
 The leading case with respect to the scope of the class of persons protected. by a shipowner's warranty of seaworthiness, is Seas Shipping Co. v. Sieracki, supra. There the Court extended the warranty of seaworthiness, traditionally owed to crew members, to a stevedore who was injured while aboard and loading the ship. The Court reasoned that the stevedore was in effect a seaman 'because he (was) doing a seaman's work and incurring a seaman's hazards'. 328 U.S. at 99, 66 S.Ct. at 880.
 
 
 39
 Although Santini was not a member of the Fling's crew, it is argued that in receiving and securing the towline to the Marine I he was performing work for the Fling traditionally done by seamen, and that accordingly he became as to the Fling a 'Sieracki Seaman'.
 
 
 40
 Appellant's contention finds some support in Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011 (5 Cir. 1969), cert. dismissed, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970), and Nikiforow v. Rittenhouse, 277 F.Supp. 608 (E.D.Pa.1967). In Grigsby the warranty of seaworthiness was extended to a land-based guard who died while attempting to effect a rescue aboard a sea-going barge. The court stated:
 
 
 41
 'His impulsive action in the best tradition of the sea gave him this highly preferred status. Since in doing these humane acts, he was doing that which a seaman responding to the call of the sea would have done, he was, in a very real sense and in the Sieracki-sense, doing the work of a seaman. He can accordingly claim the rights of a vicarious seaman including that of the warranty of seaworthiness.' 412 F.2d at 1022.
 
 
 42
 Nikiforow involved a situation factually similar in many respects to this case. There it was held that the defendant shipowner's warranty of seaworthiness extended to the plaintiff, a member of the crew of a Coast Guard cutter who was blinded when a stanchion post of defendant's vessel broke loose during an attempt to tow it off a sand bar. The court reasoned that under Sieracki the plaintiff was entitled to the warranty of seaworthiness, since he was performing a service for defendant's vessel 'that traditionally would have been done by the crew of defendant's vessel',[9] but which 'under modern division of labor * * * is performed by members of the Coast Guard, especially in situations involving pleasure craft in inland waters'. 277 F.Supp. at 611.
 
 
 43
 The district court declined to accept the reasoning of Grigsby and Nikiforow, stating that it did not 'believe the Supreme Court * * * would adopt such an extension of the concept of liability without fault'. In addition, the court distinguished those cases on the ground that no act of rescue could be attributed to Santini, who was merely 'a spectator and a victim'.
 
 
 44
 While not determinative of this action, it is noted that subsequent to the decisions in Grigsby and Nikiforow, Congress eliminated the longshoreman's claim for unseaworthiness and the action over the shipowner. The 1972 amendments to the Longshoremen's and Harbor Worker's Compensation Act, 33 U.S.C. 901 et seq., provide that a longshoreman's personal injury action against a shipowner is limited to claims based upon negligence and that the 'liability of the vessel * * * shall not be based upon the warranty of seaworthiness or a breach thereof * * *'. 33 U.S.C. 905(b).
 
 
 45
 The legislative history of the 1972 amendments indicate Congressional dissatisfaction with the extension of the warranty of seaworthiness initiated by the decision in Sieracki. The Report of the House Education and Labor Committee noted
 
 
 46
 'that the seaworthiness concept was developed by the courts to protect seamen from the extreme hazards incident to their employment which frequently requires long sea voyages and duties of obedience to orders not generally required of other workers. The rationale which justifies holding the vessel absolutely liable to seamen if the vessel is unseaworthy does not apply with equal force to longshoremen and other nonseamen working on board a vessel while it is in port.
 
 
 47
 'The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as 'unseaworthiness', 'nondelegable duty', or the like.' H.R.Rep.No.92-1441, 92nd Cong., 2d Sess. (1972), U.S. Code Cong. & Admin.News, p. 4703.[10]
 
 
 48
 It is clear that Congress is not in accord with the extension of the warranty of seaworthiness represented by Sieracki and its progeny. This affords an additional reason why the Sieracki rule should not be extended further in line with Grigsby and Nikiforow.
 
 
 49
 In addition, we agree with the district court that Grigsby and Nikiforow are distinguishable. As noted supra, Grigsby involved an affirmative act of rescue, whereas here Santini merely received and secured the towlines to the Marine I.[11] Santini was not a member of the crew of the Marine I, as was the plaintiff in Nikiforow. As discussed supra with respect to the Jones Act claim, Santini was on the Marine I for the purposes of observing what the police were doing and learning the reasons therefor, and he was not required or duty-bound to perform any services in connection with the operation of the launch.
 
 
 50
 Cross Appeal of Kellogg and Town of Westport
 
 
 51
 Kellogg and the Town of Westport have cross-appealed, contending that the district court erred in refusing to grant them attorney's fees and expenses incurred in the defense of this action. As noted supra, the court declined to rule on this claim due to the fact that Kellogg and the Town of Westport filed their notice of appeal prior to the motion to amend the findings to include an award of fees and expenses. The court did, however, indicate that it would have denied the motion, principally on the grounds that (1) Kellogg and the Town of Westport failed to request attorney's fees 'if they are successful in dismissing the third-party complaint'; and (2) the agreement which Klarman signed, promising 'to pay for all damages which may incur', was simply 'an agreement for indemnification for damages incurred in a negligent rescue'.
 
 
 52
 We agree with appellants that their failure to specifically request attorney's fees and expenses in the event of dismissal of the third-party complaint does not in itself prevent their recovery. Rule 54 of the Federal Rules of Civil Procedure provides that 'every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party had not demanded such relief in his pleadings'. See Paliaga v. Lukenbach Steamship Company, 301 F.2d 403, 410 (2 Cir. 1962).
 
 
 53
 We are satisfied, however, that the district court's interpretation of the agreement signed by Klarman is correct. The cases cited by Kellogg and the Town of Westport deal either with express warranties, made in a strictly commercial setting, to indemnify and hold harmless the party claiming fees,[12] or with the breach of a stevedore's implied warranty to perform contracted-for services in a workmanlike manner,[13] none of which have any application to the facts of this case.
 
 
 54
 Affirmed.
 
 HAYS, Circuit Judge (dissenting):
 
 55
 I dissent.
 
 
 56
 Santini was clearly a 'seaman' within the meaning of the Jones Act, 46 U.S.C. 688 (1970). The majority holds the contrary on the grounds that he was an 'observer' who 'was not really supposed to do anything' and that 'there was no evidence that he would have been reassigned to the launch.' It is uncontroverted in the record, and the majority recognizes, that Santini was aboard the launch to receive on-the-job training in the operation of the launch as part of a formal program for volunteers. Even if his duty was merely to observe the operation of the launch, he must be considered a seaman. There is no reason to believe that a trainee does not become a seaman for purposes of the Jones Act until his training period has ended. Moreover, Santini took an active part in the efforts to dislodge The Fling. He performed the tasks which would ordinarily have been performed by any seaman aboard a launch like Marine I. This court has recognized the broad definition given to the term 'seaman.' Mahramas v. American Export Isbrandtsen Lines, Inc., 475 F.2d 165, 170 (2d Cir. 1973). In Mahramas we adhered to the test established in Gerradin v. United Fruit Co., 60 F.2d 927 (2d Cir.), cert. denied, 287 U.S. 642, 53 S.Ct. 92, 77 L.Ed. 556 (1932), that seaman includes anyone engaged to serve in any capacity on board.
 
 
 57
 Klarman owed Santini a duty to provide a seaworthy vessel. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed.2d 1099 (1946). Sieracki held that the duty of seaworthiness extends not only to those directly employed by the shipowner but to all who 'perform the ship's service . . . with his consent or by his arrangement.' 328 U.S. at 95, 66 S.Ct. at 877.
 
 
 58
 The Longshoremen's and Harbor Workers' Compensation Act, as amended, 33 U.S.C. 901-950 (1970 & Supp. II 1972), is irrelevant here not merely because the 1972 amendments were enacted after the accident in question but, more important, because Santini would not have come within the coverage of the act as provided in section 903(a).
 
 
 59
 I would reverse the decision of the district court and remand the case for determination of damages.
 
 
 
 *
 Senior District Judge of the District of Montana, sitting by designation
 
 
 [1]
 Santini had been a member of the auxiliary police force since 1954 and received no compensation for his services
 
 
 [2]
 The line was owned and selected by Klarman. He testified that it was regularly used as 'a mooring line' and that it had been used in the earlier unsuccessful towing attempt by the private cruiser. Kellogg testified that 'As a rule we accepted lines from other vessels. We did not use our own lines. This was a verbal hand-me-down rule by the department.'
 
 
 [3]
 Kellogg, on the other hand, testified that Klarman used the starboard winch near the stern of the Fling, rather than the cleat
 
 
 [4]
 Under 46 U.S.C. 183(a) the liability of the owner of a vessel for any act done without his privity or knowledge shall not exceed the amount or value of the interest of the owner in the vessel. By stipulation the value of the Fling was fixed at $7,500
 
 
 [5]
 This case, which was decided after the filing of Santini's answer, held that a long-shoreman's wife could maintain an action under federal maritime law based upon unseaworthiness, for the wrongful death of her husband within state territorial waters
 
 
 [6]
 As the court recognized, the Jones Act applies only between employees and their employers. Mahramas v. American Export Isbrandtsen Lines, Inc., 475 F.2d 165, 170 (2 Cir. 1973)
 
 
 [7]
 Since the district court found that Kellogg was not negligent, it was unnecessary to consider the effect of the fellow servant rule, the Connecticut Workmen's Compensation Act, Conn.Gen.Stat. 31-284 and 31-293a, or the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. 901 et seq
 
 
 [8]
 Although Prosser testified that the winch should have been bolted, and that the bolts would be visible from an inside-the-boat inspection of the winch pedestal, the other four experts agreed that wood screws were an adequate and proper means of securing the winch
 
 
 [9]
 The court noted that 'once a ship ran aground, the officers and crew had a duty to attempt everything within their means to free the vessel, whether by attempting to tow the ship free by manning the long boats, or by carrying out anchors and attempting to pull the vessel off the obstruction'. 277 F.Supp. at 611
 
 
 [10]
 The amendments also provided for an increase in compensation benefits, thus affording an additional reason for eliminating the longshoreman's claim for unseaworthiness. Mrs. Santini of course is not receiving compensation under the Longshoremen's and Harbor Workers' Compensation Act, but is receiving compensation benefits from the State of Connecticut under its Workmen's Compensation Act
 
 
 [11]
 As the district court said, 'What act of rescue can be attributed to him? What humane act was Santini doing in responding to the call of the sea? What service was he performing for Klarman's sloop, the Fling? The most we can say is that Santini was a spectator and a victim.'
 
 
 [12]
 See, e.g., California Tanker Co. v. Todd Shipyards Corp., 339 F.2d 426 (2 Cir. 1964), and Moses-Ecco Company v. Roscoe-Ajax Corporation, 115 U.S.App.D.C. 366, 320 F.2d 685, 690 (1963)
 
 
 [13]
 See Williams v. Pennsylvania Railroad Company, 313 F.2d 203, 212-213 (2 Cir. 1963). As we pointed out in Falletta v. Costa Armatori, 476 F.2d 316, 317 at n. 1 (2 Cir. 1973), the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act also eliminated stevedore indemnity to the shipowner, based upon a breach of the warranty of workmanlike service. The limitation of the shipowner's liability to his own negligence obviates the need for indemnity from the stevedore, and thus the amendments provide that the stevedore-employer shall not be held liable to a shipowner for damages paid by the latter to longshoremen, and that warranties to the contrary shall be void. 33 U.S.C. 905(b)