Pedro SALGADO, Appellant,

v.

M. J. RUDOLPH CORP., Appellee.

No. 374, Docket 73–2690.

United States Court of Appeals,
Second Circuit.

Argued Jan. 27, 1975.

Decided March 24, 1975.

---

Lester E. Fetell, Sergi & Fetell, Brooklyn, N. Y., for appellant.

Joseph Arthur Cohen, Alexander, Ash, Schwartz & Cohen, New York City (Sidney A. Schwartz, New York City, of counsel), for appellee.

Before KAUFMAN, Chief Judge, and MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This case involves the question whether appellant, injured on board a floating crane in 1966, can sue his employer, the owner of the crane, for negligence or breach of the warranty of seaworthiness. The appeal is from a judgment of dismissal by the United States District Court for the Eastern District of New York, Leo F. Rayfiel, Judge, sitting without a jury. The sole issue before the court below was one of status, whether appellant was a seaman entitled to sue under the Jones Act, 46 U.S.C. § 688, and for breach of the warranty of seaworthiness, or a longshoreman entitled to sue under Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), for breach of the seaworthiness warranty. The parties had agreed that, if necessary, liability and damages would be determined in a second trial. The court below found that appellant was neither a seaman nor a longshoreman but rather a harborworker entitled to no relief beyond the compensation he had received under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950.

We reverse on the grounds that appellant is a *Sieracki* seaman, a longshoreman working aboard a vessel, who is owed a warranty of seaworthiness by the vessel's owner, his employer.

## I. FACTS.

On September 19, 1966,[1] appellant Pedro Salgado was injured on board a floating crane when an electromagnet, used in loading scrap metal onto freighters, slid, crushing his foot. The floating crane, known as the R6, was owned by the appellee, M. J. Rudolph Corp. (Rudolph). Rudolph, Salgado's employer on the day of the accident, was a stevedoring company which had employed Salgado for approximately a year prior to the accident on an hourly basis when Salgado's services were needed. The court be-

low found that Salgado's duties included working winches on the decks of ships, acting as a signalman to crane operators, and, on occasion, working on floating cranes—tying, untying and moving them. When working winches Salgado would, by the use of a chute, assist in placing the cargo into the hold of a ship. During the year before the accident Salgado also had worked for other stevedoring companies on an hourly basis.

The day before the accident a foreman from Rudolph, Mr. Bonilla, had called Salgado and told him to report to work the next day. Rudolph had contracted to load a freighter with scrap metal. Rudolph did not own the freighter, nor is the freighter a party to this suit. Salgado was a member of the gang that loaded the freighter. The loading was done by means of the floating crane, "R6," which, with either a bucket or a magnet, transferred scrap metal from a lighter to the freighter. The R6 was between the freighter and the lighter during this process. It had no motive power of its own but was moved over the water by tug boats and moved between hatches of a vessel by lines from the ship's winches maneuvered by workers on the deck of the R6. When a freighter was being loaded the crane's operator sat in an enclosed cab approximately 30 feet above the deck. By the use of levers he could move the cab and permanently affixed boom in a 160 degree circular motion and could raise and lower the boom. The fireman/oiler aboard the R6 maintained the diesel and electric power for these operations.

Appellant spent most of the day of the accident on the deck of the freighter using the ship's winches to move a chute into a hatch so that the hold could be loaded with metal. After the hold was filled it was necessary to move the R6 by maneuvering lines. Salgado and two other Rudolph employees were told by a Rudolph foreman to go onto the R6, where Salgado was told to pick up a loose sling. As he did so the boom on

1. Before the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act. *See* note 4 *infra*.

the R6 moved, the R6 listed, and the electromagnet sitting on the deck of the R6 slid, hitting Salgado's foot. It should be added that Salgado neither ate meals nor slept on the R6 and that the R6 was not equipped with sleeping facilities.

Appellant sought and accepted benefits under the Longshoremen's and Harbor Workers' Compensation Act. He filed two suits, one alleging a seaman's cause of action, the second a longshoreman's action against his employer, Rudolph. The cases were consolidated for trial.

## II. CONTENTIONS OF THE PARTIES.

Appellant argues that the court's finding below that he is not a seaman is clearly erroneous. He also argues that as a matter of law and fact the determination that he is not a longshoreman should be reversed.

Appellee, in addition to supporting the trial court's determination that Salgado is a harborworker and unable to sue his employer under either the Jones Act or the *Reed* doctrine, argues that appellant's status is a question of fact reviewable only under a clearly erroneous standard and that the R6 is not a vessel.

## III. SHIPOWNERS' HISTORIC LIABILITY.

A brief historical review may serve to clarify our thinking. The Jones Act, 46 U.S.C. § 688,[2] provides that a seaman may maintain an action at law for damages. It will be recalled that this act was passed in 1920 to allow actions in

negligence, overturning that portion of The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903), to the contrary. G. Gilmore & C. Black, The Law of Admiralty §§ 6–3, 6–20 (1957) (hereinafter Gilmore). *The Osceola* had, however, established a seaman's cause of action for breach of the warranty of seaworthiness. That was a limited remedy until Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), held that seaworthiness encompassed operating negligence and Seas Shipping Co. v. Sieracki, 328 U.S. at 94–95, 66 S.Ct. 872, articulated the warranty as one of strict liability. *See* Gilmore §§ 6–39—6–41. *Sieracki* also held that the shipowners' warranty of seaworthiness extended to stevedores injured on board ship. 328 U.S. at 95–97, 66 S.Ct. 872.

The Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950, was passed in 1927 after the Supreme Court had consistently held that state workmen's compensation acts could not constitutionally be made applicable to admiralty actions which were exclusively federal. Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917); Washington v. W. C. Dawson & Co., 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924). *See* Gilmore §§ 6–45—6–46. That act, providing compensation payments without proof of fault, excluded from its coverage

> A master or member of a crew of any vessel, nor [sic] any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

2. 46 U.S.C.A. § 688:

> Recovery for injury to or death of seaman
>
> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action

> all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.
>
> There has been so much litigation over the meaning and scope of the Jones Act that it has been remarked that the Supreme Court should have struck it down "as offensive to the due process clause by reason of impossibly bad drafting." G. Gilmore & C. Black, The Law of Admiralty 282 (1957).

33 U.S.C. § 903(a)(1). Thus "seamen" wished and were able to retain their Jones Act rights in negligence against their employer as well as their ability to sue under the warranty of seaworthiness and for maintenance and cure. *See* Gilmore § 6–46 at 338.[3]

The LHWCA does not cover seamen, and compensation under it was the only remedy for a longshoreman against his employer, the stevedoring company, for injury on shipboard. *See* Victory Carriers, Inc. v. Law, 404 U.S. 202, 212–13 n. 12, 92 S.Ct. 418, 30 L.Ed. 2d 383 (1971). In 1963 Reed v. The Yaka, *supra,* however, provided an exception to the then exclusive remedy provision of the LHWCA. 33 U.S.C. § 905.[4] *Reed* held that a longshoreman injured on board a vessel *owned* (or operated under a bareboat charter) *by his employer,* the stevedoring company, could sue the employer for breach of the warranty of seaworthiness despite § 905. 373 U.S. at 412–16, 83 S.Ct. 1349. *Accord,* Jackson v. Lykes Bros. Steamship Co., 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967).

In *Reed,* however, the injury occurred on board the vessel being loaded; here the injury occurred upon a floating crane (owned by the stevedore) used to load a freighter not owned by the stevedore. There is no allegation of the freighter's unseaworthiness.

**3.** The LHWCA also had the apparently inadvertent effect of overturning International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926), which had held that longshoremen were seamen for purposes of the Jones Act since they were "engaged [in] maritime service formerly rendered by the ship's crew." *Id.* at 52, 47 S.Ct. at 19. When *Haverty* came down Congress had already completed committee action on the bill and passed the act in 1927, "apparently unwilling to entrust [compensation] protection to *Haverty's* dubious construction of the Jones Act." Note, Risk Distribution and Seaworthiness, 75 Yale L.J. 1174, 1182 (1966).

**4.** 33 U.S.C. § 905, applicable at the time of this case, read:

Exclusiveness of liability

The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under this chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, nor that the employee assumed the risk of his employment, nor that the injury was due to the contributory negligence of the employee.

That section was amended Oct. 27, 1972, by Pub.L.No.92–576, § 18(a), 86 Stat. 1263, to become, with minor changes, § 905(a); § 905(b), which reads as follows, was added:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such actions shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

In addition to subsection (b) which altered the court-made no-fault law of unseaworthiness, and because of such change, Pub.L.No.92–576 also increased the benefits available under the LHWCA. *See* H.R.Rep.No.92–1441, 92d Cong., 2d Sess. (1972).

Since Salgado's injury occurred in 1966, his recovery is unaffected by the amendment. Nor is the amendment relevant in construing prior law as Salgado would have received the lower compensation benefits and thus not have benefitted from the purpose of the amendment.

## IV. APPLICABILITY OF THE JONES ACT.

To be a Jones Act seaman and thus entitled to sue for negligence as well as breach of the warranty of seaworthiness but not entitled to Longshoremen's Compensation, this court has said, "the vessel must be in navigation, there must be a more or less permanent connection with the ship, and the worker must be aboard naturally and primarily as an aid to navigation". Klarman v. Santini, 503 F.2d 29, 33 (2d Cir. 1974) *quoting* Harney v. William M. Moore Building Corp., 359 F.2d 649, 654 (2d Cir. 1966). Here the parties stipulated that the R6 was in navigable water. It is unnecessary in the context of the Jones Act claim to determine whether the R6 is a vessel or whether Salgado was aboard to aid in her navigation. The court below found that Salgado did not have a "more or less permanent connection" with the R6. We find the evidence sufficient to support such a finding. *Cf.* Bullis v. Twentieth Centry-Fox Film Corp., 474 F.2d 392 (9th Cir. 1973); Thibodeaux v. J. Ray McDermott & Co., 276 F.2d 42 (5th Cir. 1960). *See also* Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931 (1944). Salgado's presence on the R6 was only for the purpose and duration of loading the freighter alongside. While he handled lines to move the R6, that does not require a finding of seaman's status. *See* South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732 (1940).

On the other hand, the fact that Salgado ate and slept ashore does not necessitate a finding that the status of seaman did not exist. *See* Weiss v. Central Railroad Co., 235 F.2d 309 (2d Cir. 1956). In *Weiss*, however, the district court had made a finding that a temporary novice pilot was a seaman, a finding which was not held to be clearly erroneous. Here Salgado was not a pilot and the district court did not find him to be a seaman. In Harney v. William M. Moore Building Corp., *supra*, this court held that the question of status of a pump engineer permanently assigned to tend a barge was for the jury. Here the facts were submitted to the factfinder. Salgado, we affirm, was not a Jones Act seaman.

## V. APPLICABILITY OF *Sieracki* AND *Reed*.

Although not disputing that Salgado was a longshoreman for purposes of Longshoremen's Compensation which has already been paid, appellee does dispute that Salgado was a longshoreman for purposes of applying Reed v. The Yaka, *supra*. Appellee does so by arguing that while Salgado may have been a longshoreman *vis a vis* the freighter, he was not *vis a vis* the R6, which, appellee also argues, was not a vessel. The arguments imply that the R6 did not owe a warranty of seaworthiness to Salgado under *Sieracki* and thus *Reed* is inapplicable. Since the issue is whether duty is owed rather than one of status, it is a question of law. Salgado's performance of a longshoreman's duties is not disputed.

Appellee's argument (and the district court decision) must fall. The R6 is a vessel; Salgado was performing longshoreman duties on board, albeit not toward that vessel; and he was entitled to work on a seaworthy ship.

A. *The R6 is a vessel.* The cases cited by appellee for the proposition that the R6 is not a vessel are inapposite as both involve stationary drilling platforms fixed in coastal waters. Freeman v. Aetna Casualty & Surety Co., 398 F.2d 808 (5th Cir. 1968); Dronet v. Reading & Bates Offshore Drilling Co., 367 F.2d 150 (5th Cir. 1966). The R6 is a mobile floating crane, although having no motor power. A barge without motive power is a vessel, Norton v. Warner Co., *supra*, as is a dredge rarely in transit. Senko v. LaCrosse Dredging Corp., 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957). Harvey v. William M. Moore Building Corp., *supra*, involved a barge supporting a crane as a vessel. The R6 is not a raft tied to shore so as to assume the characteristics of a floating dock. Powers v. Bethlehem Steel Corp.,

477 F.2d 643 (1st Cir.), cert. denied, 414 U.S. 856, 94 S.Ct. 160, 38 L.Ed.2d 106 (1973). Rather the R6 is a floating crane and similar to a floating derrick,[5] also a vessel. Peck v. United States Steel Corp., 315 F.Supp. 905 (D.Minn. 1970), aff'd, 446 F.2d 891 (8th Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972). Thus the R6 is a vessel. Additionally, the R6, by means of its crane, was transporting goods over water.

■ B. *Salgado was owed a duty of seaworthiness by the R6.* In *Peck, supra,* the court held that the owner of the derrick barge owed the plaintiff iron worker a warranty of seaworthiness although the plaintiff was not engaged in construction work relating to the S2 derrick. The court relied on *Sieracki, Reed* and Jackson v. Lykes Bros. Steamship Co., *supra.* Although the printed facts in *Peck* are sketchy (apparently plaintiff was to repair a bridge),[6] the case is in point and reaches a legally accurate result. *Peck* found, as do we, that "Under the *Sieracki* doctrine, the warranty of seaworthiness extends to a shore worker who 'is, in short, a seaman . . . doing a seaman's work and incurring a seaman's hazards.' *Sieracki, supra,* 328 U.S. at 99, 66 S.Ct. 872." *Peck,* 315 F.Supp. at 906. A longshoreman, such as Salga-

do, is such a person, subject to such hazards. International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926). The hazards he faces do not change as he moves from the freighter to the R6, both of which are vessels.

In fact, stevedoring is one of the most hazardous occupations. In a survey done some years ago by the National Academy of Sciences it was found that one out of every two longshoremen was injured on the job and one out of six received a disabling injury. National Academy of Sciences, National Research Council, Maritime Cargo Transportation Conference Longshore Safety Report (1956). *See* Note, Risk Distribution and Seaworthiness, 75 Yale L. J. 1174, 1186–87 (1966).[7]

■ Salgado was loading the freighter on the day of the accident. At the time of the accident he was on the R6 to move it from a loaded hatch. Thus the status of longshoreman remained with Salgado throughout his duties of loading scrap. Those duties would even include returning to shore. His status as a longshoreman on board a vessel could not change until he reached land. He was hired to load and unload a ship. The fact that he was not loading or unloading the crane is irrelevant; he was doing

---

**5.** Derricks and cranes are both hoisting machines used in cargo handling, construction and similar projects. Derricks generally have a mast and slanting boom while cranes may have either a horizontal boom and a mast or a slanting boom but no mast. *See* Derricks and Cranes, 6 McGraw-Hill Encyclopedia of Science and Technology 462 (1966).

**6.** The unprinted findings of fact in Peck v. United States Steel Corp., 315 F.Supp. 905 (D.Minn.1970), aff'd, 446 F.2d 891 (8th Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972), show that the plaintiff had been sent to the construction site to help build a bridge. A floating derrick, the S2, which would lift the steel erection materials from a supply barge to the bridge was in the process of being assembled; the plaintiff aided in the assembly. On the day of the accident he was on board the S2 which was lifting a tug from shore to the water. The court held that plaintiff was owed a warranty of seaworthiness even though "[t]he injury to plaintiff

was not directly related to any construction work on the S2 derrick." 315 F.Supp. at 908.

**7.** Mr. Justice Douglas also discussed these hazards in the appendix to his dissenting opinion in Victory Carriers, Inc. v. Law, 404 U.S. 202, 218 n. 1, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). He set forth the following statistics:

Stevedoring is one of the most accident-prone professions in American industry. According to the National Academy of Sciences-National Research Council, Maritime Cargo Transportation Conference, Longshore Safety Survey 22–23 (1956), hazardous industries have the following accident frequency rates:

| | |
|---|---|
| Stevedoring | 92.3 per million man hours worked |
| Logging | 74.3 |
| Structural Steel Erection | 47.5 |
| Saw and Planing Mills | 42.0 |
| General Building | 37.0 |

See also New York Shipping Assn., Safety Bureau Annual Accidents (1965).

work which was the primary purpose of the crane, i. e., loading ships. As such he was a longshoreman on the crane performing duties in the nature of a seaman for the purpose of both vessels (the freighter and the crane) and owed a warranty of seaworthiness by each. In this case the warranty was allegedly breached by the floating crane, the R6, and under Reed v. The Yaka, *supra,* Salgado can sue to recover for its breach despite the fact that the breach is against his employer.

 Had Salgado been injured on the freighter he could have sued the ship owner. *Sieracki, supra;* Jackson v. Lykes Bros. Steamship Co., *supra.* If he had been injured on land by the freighter's crane he could have sued the freighter's owner. Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). Had Salgado been injured by Rudolph's crane on the freighter, he could have sued the freighter's owner, Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954) (who for breach of the independent duty of proper stowage could have impleaded Rudolph. Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)). Thus the Court, before Congress increased Longshoremen's Compensation payments, *see* note 4 *supra,* liberally expanded the scope of the warranty of seaworthiness to protect workers less able to protect themselves. To deny suit to a longshoreman because he was not loading the R6 itself undercuts the "humanitarian policy" of maritime law. *Reed,* 373 U.S. at 413, 83 S.Ct. 1349. That policy extends the warranty of seaworthiness to longshoremen, *Sieracki, supra,* on board ship. If in the above instances Salgado can recover for breach of warranty, the facts that the crane and freighter float separately and are owned by separate employers do not change the result. Once the stevedore undertakes to own its own vessels to load ships, it must also warrant to its employees who serve the load-

ing function of the vessel that those vessels are seaworthy. Apparently the magnet slid because the floating crane listed. Such a condition would not occur on land. It is a question for the fact-finder whether the magnet, without supports to keep it stable on a listing deck, was an unseaworthy condition or whether the listing was itself caused by such a condition.

Judgment reversed and remanded.