Anita Laudin BRANIFF, Administratrix of the estate of John Edward Braniff, Deceased and Matthew F. Belin, Administrator of the Estate of James L. Brown, Deceased, Appellants,

v.

JACKSON AVE.–GRETNA FERRY, INC., Appellee.

No. 18137.

United States Court of Appeals
Fifth Circuit.

July 8, 1960.

Hutcheson, Circuit Judge, dissented.

Felicien Y. Lozes, Thomas J. Taylor, Howard J. Taylor, Taylor & Taylor, New Orleans, La., for appellant Belin.

George B. Matthews, N. B. Barkley, Jr., New Orleans, La., for Jackson Ave.-Gretna Ferry, Inc., Lemle & Kelleher, New Orleans, La., of counsel.

Before RIVES, Chief Judge, and HUTCHESON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

We face again the oft presented question of who is a seaman. By summary judgment the District Court held that neither of the decedents was a seaman.

Though the solution is generally a hard one, and here the question is especially close, we disagree and reverse.

One of the difficulties in this field is that in determining relative rights the status of the ambiguous-amphibious maritime worker is arrived at through a process of exclusions, some statutory, some basically constitutional. For example, here we deal with two workers claimed to be seamen and hence the proper subject of death actions under the Jones Act, 46 U.S.C.A. § 688. The Employer counters with the contention that for these water-borne deaths, the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., was the exclusive standard. But that Act [Longshoremen's] by its own terms excludes the "master or member of a crew of any vessel." 33 U.S.C.A. § 902(3). In many ways the problem is comparable to the one posed when the contest is between state versus Longshoremen Act compensation coverage. Again, the Longshoremen's Act is exclusive, 33 U.S.C.A. § 905, where applicable. The troubled waters occur not in the end result so much as they do in the determination of which law is applicable. For the Longshoremen's Act provides that it shall apply as to injuries sustained upon navigable waters of the United States, but only "if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law. * * *" 33 U.S.C.A. § 903. A decision in these cases, then, is seldom reached in terms that the person is not of one specified status (e. g., seaman) *because* he is another (e. g., Longshoremen's Act) for that is really the result, not the reason why.

These two cases concern the employees, John Edward Braniff and James L. Brown. We discuss primarily that of Braniff since he was the superior to whom Brown was attached. Brown was to be in attendance on Braniff whenever and wherever Braniff went during his duty hours. In an area already crowded with the figuratives of Twilight Zone, the no-man's-land, and the like, it will not hurt to add another. At this juncture at least, Brown was as close as Braniff's shadow, and where Braniff ends in this status seeking, there will be Brown as well.

The Employer owns and operates several ferries in the Port of New Orleans, including the Leo B. Bisso. Braniff at the time of his death was employed, as he had been for many years, as Superintendent in charge of all maintenance, repair and overhaul work for the company. On September 2, 1958, about 9:15 a. m. Braniff, with his helper Brown, were in a work boat made fast to the side of the Employer's ferry Leo B. Bisso. They were engaged in making repairs to the machinery of the ferry while it was actually in operation drifting down the Mississippi River. Through action of those aboard the ferry asserted to have been negligent, the work boat capsized resulting in the drowning of Braniff and Brown.

As Superintendent, Braniff was responsible for all maintenance and repair work to the marine and shore equipment belonging to the company. He was in charge of and directed the use of the "shore gang" to carry out these responsibilities. Members of the shore gang were hired and fired on his direction. The shore gang comprised approximately six persons, a welder, a carpenter and several ordinary laborers. The shore gang took orders directly from Braniff.

Braniff was a master mechanic and consequently orders to him were of a general nature leaving most of Braniff's actual operations to his own discretion. It was the general regular practice for Braniff and the shore gang to report at the waterfront each morning. At that time Braniff would ordinarily board each of the ferries to ascertain from the captains whether any repair or maintenance work needed to be done. The repair work under the immediate and overall supervision of Braniff was of several kinds, and his personal attendance on any such work was dependent upon the technical nature of the needed repair. Repair and overhaul work was often done

on ferries while actually operating, that is without being laid up. At other times, the boats would be withdrawn from service. Occasionally his work took him to the company's shop located at the foot of Walnut Street. Sometimes the repairs required that the equipment be transported to independent repair contractors ashore. If, after the morning inspection made aboard each of the ferries, there were no repairs to be accomplished on any or all of them, Braniff would disperse the gang to complete unfinished work, presumably both ashore and afloat, or send them to other jobs which he wished done. In all of this, Brown was assigned to Braniff as his helper, and he accompanied Braniff wherever Braniff went. His work was to remove or lift any heavy equipment or parts which might be necessary during a repair operation and generally to assist Braniff in his functions.

Of course, Braniff was not assigned to, nor did he stand a watch, aboard any one of the ferries. He, as well as Brown and other members of the shore gang lived ashore and their ordinary hours of work were from 8:00 a. m. to 4:00–4:30 p. m. each day. Braniff was, however, on 24-hour notice in case of emergencies, and it was understood by the gang that in an emergency, they would also be subject to call to assist Braniff.

In addition to the removal, repair or overhauling and reinstallation of major component pieces of equipment making up the engineering plants of the ferry boats performed while the boats were out of service, Braniff was also responsible for the weekly "washing out" of the boilers, and the raising and lowering of the vehicular runways due to erratic rise and fall of the river. His presence aboard the ferries was essential when the latter operation was performed to assure that it was safely done. In addition he was responsible for maintenance and repair of the ferry houses and landings on shore and was in charge of the machine shop on Walnut Street where some minor repairs to component pieces of equipment

were accomplished and some fabrication work was carried on.

Holding that on the uncontroverted facts no reasonable minds could disagree that Braniff and Brown were not members of a crew of a vessel, the District Court granted summary judgment for the Employer.

■ Of course, in testing summary judgment, we must determine whether there was no genuine issue as to any material fact. F.R.Civ.P. 56(c), 28 U.S.C.A. As a procedural matter, the controversy may be made to appear by controverting affidavits of which there were none here. Cunningham v. Securities Investment Co., 5 Cir., 1960, 278 F.2d 600. Or it may arise from the face of the moving papers showing that certain "facts" are variable or uncertain or indefinite or that from established or uncontradicted physical or similar facts different inferences may be drawn. We are confronted with the latter.

■■ After the thorough and painstaking discussion for this Court in Offshore Co. v. Robison, 5 Cir., 1959, 266 F.2d 769, 1959 A.M.C. 2049, of all of the significant cases by which the concept of seaman has been broadened as a question of fact for the trier, little purpose would be served in retracing these steps to pick out and discuss specific factors thought relevant or decisive for our present case. We think it sufficient that we merely repeat what was there set forth as this Court's position stated affirmatively. "There is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its

movement or during anchorage for its future trips." 266 F.2d 769, at page 779. And of equal importance to our present problem was this lesson from the developmental process of case-by-case adjudication which we there regarded as more significant than the catchphrases frequently used. "Attempts to fix unvarying meanings have a firm legal significance to such terms as 'seamen', 'vessel', 'member of a crew' must come to grief on the facts. These terms have such a wide range of meaning under the Jones Act as interpreted in the courts, that, except in rare cases, only a jury or trier of facts can determine their application in the circumstances of a particular case. Even where the facts are largely undisputed, the question at issue is not solely a question of law when, because of conflicting inferences that may lead to different conclusions among reasonable men, a trial judge cannot state an unvarying rule of law that fits the facts. * * *" 266 F.2d 769, at pages 779–780.

██ With this approach we think there are a number of conflicting inferences which reasonable men could draw from the facts set forth in the affidavits. And this is so whether such "facts" are regarded as uncontradicted or not.

It was a regular part of Braniff's duties that he board each of the ferries every morning. This was for such inspection as he might think necessary and obviously for consultation with the master and engineers of the ferry. It is quite plain that much of the time the repair or maintenance work shown by the morning inspection to be desirable or needed was accomplished without ever withdrawing the ferry from service. Braniff with all or such part of the shore gang as he thought necessary would remain aboard, and while the ferry was still in her regular operation going to and fro from landing to landing, the work would be done. Indeed, it was just such work as was being performed at the time of the accidental drowning. To correct some difficulty with the ferry's machinery, it was necessary that Braniff and Brown be over the side in a work boat made fast alongside. The ferry continued to move or drift in the river and the capsizing occurred. Additionally, there was regular routine work performed each week by Braniff and his gang which required that they go aboard each ferry. This included such things as washing out the boilers. Other work, although not precisely scheduled because of the nature of things, routinely required that he be aboard to supervise or perform it. This included the raising and lowering of vehicular ramps. Actually the uncertainty of the time that this operation would be required makes his relationship to the ferry more, not less, substantial. For when and as often as changes in the stage of the river made adjustment necessary, Braniff was needed to permit the ferry to continue to operate safely.

The affidavits actually reflect on their face an unavoidable uncertainty as to many things which have relevance in judicially devining the status of seamen. One, of course, is the amount of time Braniff was, or was required to be, aboard any particular ferry. Another was the regularity of it. It is virtually uncontradicted that each morning he regularly went aboard every ferry. His presence there was to inspect and perform repair and maintenance work as may be needed, or make whatever arrangements were necessary for the removal of the defective equipment or, perhaps, plan for the withdrawal of the ferry from service. Whether this took all day or half a day or what part of a day is not shown. The affidavits, however, do reflect that this activity aboard the ferries was considered a principal part of his work. One affidavit, for example, after reciting his customary practice to board each ferry every morning, stated that, "if there were *no* repairs to be accomplished, he [Braniff] would disperse the 'gang' to complete unfinished work, or send them to other jobs * * ." One obvious inference open from the manner in which this is stated is that if, on the other hand, there *were* repairs to be accomplished, Braniff and his crew

would remain aboard as long as needed whether an hour, a half day, a day or two days. Similarly, this same affidavit stated that *"much* of Braniff's work was done aboard the 'cold' boats, temporarily taken out of service * * *." Presumably this referred to those ferries which were temporarily laid up awaiting repairs and which could not be repaired while continuing in service. Of course, *"much"* is a relative term both in point of time and in importance of the work being done or to be done. Along the same lines is the statement which follows "that *sometimes*, however, his work took him to the company's shop * * *." Just how much was this "much" and just what times was "sometimes"? How did it add up in point of time or importance or in the nature of work performed in contrast, say, with the time spent aboard each of the ferries doing maintenance and repair work while the ferries continued to operate? The negative limits of these questions are not established by the affidavits. Since by the nature of things these activities are relative, the affidavits disclose upon their face both the existence of uncertainty in such point of time and importance as well as a classic situation for the drawing of conflicting inferences.

We emphasize this not because of any technical imperfections of the affidavits, but because these very uncertainties have an immediate relevance to the determination of status as a seaman. The usual thing, of course, is for a person to have a Jones Act seaman status in relation to a particular vessel. But there is nothing about this expanding concept to limit it mechanically to a single ship. If the other factors summarized above and set out in such detail in Offshore Company v. Robison, supra, are otherwise present, we see no insurmountable difficulty with respect to element (1) in the fact that such person is "assigned permanently to" several specific vessels "or perform[s] a substantial part of his work on the" several specified "vessel[s]." Offshore Company v. Robison, supra, 266 F.2d 769, 779. Of course, it must not be spasmodic

and the relationship between the individual and the several identifiable ships must be substantial in point of time and work. Clearly, no difficulty is encountered with element No. (2) for it is uncontradicted that Braniff performed duties which contributed directly to the functioning of the vessels, to the accomplishment of their missions as ferries and to the operation and welfare of each of the vessels in terms of maintenance both during its movement and while laid up for future trips. See 266 F.2d 769, at page 779.

In view of the contemporary and continuing development of the law in this area, we do not regard as significant the earlier cases so earnestly pressed by the Employer. Kraft v. A. H. Bull S. S. Co., D.C.S.D.N.Y.1939, 28 F.Supp. 437, 1939 A.M.C. 1114; Rackus v. Moore-McCormack Lines, Inc., D.C.E.D.Pa.1949, 85 F.Supp. 185; Gonzalez v. Riverside & Fort Lee Ferry Co., D.C.S.D.N.Y.1942, 43 F.Supp. 366, 1942 A.M.C. 403; Reyes v. A. H. Bull S. S. Co., D.C.S.D.N.Y.1948, 80 F.Supp. 223, 1948 A.M.C. 1493. And we think there are substantial differences in the facts in Zientek v. Reading Co., 3 Cir., 1955, 220 F.2d 183, 1955 A.M.C. 688, and the inferences which we have briefly summarized in the present case.

A company pilot in the regular employ of a concern operating an identifiable fleet of vessels who customarily and regularly boards every one of several specified vessels to dock and undock them would certainly satisfy the requirement that his duties contribute to the functioning of the vessel and to the accomplishment of its mission. If working regularly on all of them performing a substantial part of his work on each, the other element would likewise be satisfied. A declaration that such a person was a seaman with respect to injuries received on any one of them would afford "no reason for lamentations." 266 F.2d 769, 780. No more so should there be for an engineer performing like regular services of immediate, direct, critical importance to the operation of the ferries as ferries. As these conflicting inferences are open

upon the moving papers or there is reasonable doubt thereof, Heyward v. Public Housing Adm., 5 Cir., 1956, 238 F.2d 689, summary judgment was not warranted and the case must be reversed and remanded for further and consistent proceedings. Carss v. Outboard Marine, 5 Cir., 1958, 252 F.2d 690, 1958 A.M.C. 638; Millet v. Godchaux Sugars, 5 Cir., 1957, 241 F.2d 264. And especially pertinent is our recent case of Robbins v. Milner Enterprises, Inc., 5 Cir., 1960, 278 F.2d 492, in which we pointed out very specifically that the reversal of summary judgment does not foreclose the right and the imperative duty of the District Judge to test the case against the actual evidence adduced at every stage of the trial. Nor is it a forecast that on remand the case must go to the jury. That depends upon the actual proof made and such proof may fall way short.

Reversed and remanded.

HUTCHESON, Circuit Judge (dissenting).

I realize that strong words are the usual resort of him who wants for reasons. I am, however, in complete disagreement with what I regard as an insupportable result and with the bewordling by which the majority opinion seeks to rationalize it. I have, therefore, decided to unpack my heart with words in the hope that at least one of my brethren will repent and turn away from the error of his way.

The opinion presents the case of Offshore Co. v. Robison, 5 Cir., 266 F.2d 769, as a case to end all cases and an opinion to end all opinions in the field with which the case at bar deals. With the deference and awe of those who follow humbly and afar off, it reverently commends the study of the case and opinion as guide and leader to a fuller understanding of "this expanding conception * * * in the contemporary and continuing development of law in this area".

I cannot, therefore, do better for my opening than by (1) stating that Judge Skelly Wright, the trier of the much vaunted Robison case, was also the trier of this case; and (2) taking my stand with him and quoting his succinct and irrefutable reason for judgment:

"*Plaintiffs were not members of a crew of a vessel in that they were not more or less permanently employed aboard a vessel.* Senko v. LaCrosse Dredging Corp., 352 U.S. 370, 371 [77 S.Ct. 415, 1 L.Ed.2d 404]; Swanson v. Maria [Marra] Brothers, Inc., 328 U.S. 1 [66 S.Ct. 869, 90 L. Ed. 1045]; Perez v. Marine Transport Lines [D.C.], 160 F.Supp. 853. *About this, on the uncontroverted facts of this case, no reasonable men should disagree.* Texas Co. v. Savoie, 5 Cir., 240 F.[2d] 674." (Emphasis added).

In Adams v. Kelly Drilling Co., Inc., 5 Cir., 273 F.2d 887, 889, a plaintiff, against whom a jury had returned a verdict, and who was here invoking Judge Wright as a Daniel come to judgment and Judge Wisdom, the organ of the court in the Robison case, as the father of wisdom in this field, insisted:

" 'We submit that the Circuit Courts are the instruments for reviewing the findings of juries, and must reverse the said findings when they are in error.' "; and that the decision in the Robison case must be read as not only favorable to the plaintiffs in that case but favorable to plaintiffs generally.

Agreeing with appellee that this was a misstatement of our role, we agreed with it too, that "appellants' reliance on the Robison case as a sort of general declaration or decision that, in all cases where it is alleged that plaintiff, * * * is a seaman and member of a crew, a verdict for plaintiff is demanded, is completely misplaced".

Completely rejecting plaintiffs' claim that Robison, for claims under the Jones Act, was a kind of plaintiffs' great charter, and declaring that such view represents a complete misreading of the opinion, this court, in the Adams case, went on to say:

" * * * while many of the things said arguendo in that case

might be regarded as slanting this way or that, the opinion can be quoted as conclusive authority only as to its two concluding paragraphs:

"'On the facts of this case, there was sufficient evidence for the case to go to the jury for the determination of whether Robison was a seaman, *a member of the crew of a vessel,* for the purposes of the Jones Act and for purposes of recovering under the warranty of seaworthiness. (Emphasis supplied.)

"'We have considered all of the other points relied on by the parties to this appeal. We find it unnecessary to discuss these points.'" 273 F.2d at page 890.

In what has been said above, there has been no disposition to diminish the real contribution of the Robison case in the discussion and analysis of the controlling decisions which have dealt with the law in this field. This is particularly true of the statement of the court at page 774 of 266 F.2d:

"In 1927, partly as a result of Haverty, Congress adopted the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, 33 U.S.C.A. § 901 et seq., covering all maritime workers except masters or 'members of a crew of a vessel.' The Supreme Court has held that the effect of this act is to restrict the benefits of the Jones Act to 'members of a crew of a vessel'. Swanson v. Marra Bros., Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045."

The majority opinion in this case, muddying the waters a little with talk of the "Twilight Zone", "the no-man's-land", phrases having application only where the question is whether the federal or a state compensation act applies, and none whatever to cases of this kind involving the question of whether the Longshoremen's Act or the Jones Act applies, avoids the effect of the downright recognition of the law and fact that plaintiffs' remedy was under the Longshoremen's Act, unless they could show that they "were members of a crew of a vessel in that they were more or less permanently employed aboard a vessel". In its quotation from the Robison case, the opinion does use the words "Members of a crew". In stating the question for decision here, however, it assiduously and persistently avoids stating whether the plaintiffs were "members of a crew more or less permanently employed aboard a vessel". The result is that the opinion, rejecting the acid test, finds *no difficulty* in holding that the superintendent and his helper, in no sense under the facts of this case *members of a crew of a vessel within the crucial test,* could be regarded as members of the crews of all the ferries and, therefore, more or less permanently employed aboard each and all of them.

Finally, as an apparently clinching argument, it puts forward the case of the pilot and, voicing the profound opinion that a "declaration that a pilot was a seaman with respect to injuries received on any one of the ships he pilots out to sea would afford 'no reason for lamentations'.", it seems to find in this question begging a sound reason for deciding this case which involves not a pilot but a superintendent and his helper to whom the Longshoremen's Act clearly applies. In putting the pilot illustration forward, the opinion completely disregards the factors controlling here: (1) that a pilot is not, and could not be said to be, included in the Longshoremen's Act; (2) that he is by nature and occupation a seaman under the decisions, 48 Am.Jur., "Shipping", "Seaman", Sec. 144; and (3) that apparently under Braen v. Pfeifer, 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191, as such he would be entitled to a recovery under the Jones Act without regard to where the injury occurred.

In respect to the three concluding sentences of the opinion which, seeking to limit the scope and effect of the decision only to forbidding summary judgment action, and holding out to the district judge that on the trial of the case the opinion does not "forecast that on remand the case must go to the jury", I can say only that if all the opinion amounts to is that this is not a kind of case in

which summary judgment should be resorted to, the long and detailed opinion seems to me to be much ado about nothing. For all that needed to be said in that event was to refer to one or two cases which have looked askance at the use of summary judgments in certain kinds of cases, and to add this kind of case to that catalogue.

In my view, the majority opinion does a great deal more than this, plumping, as it does, for the general idea that a jury must, in any case where a longshoreman claimed to be a seaman, have submitted to it for decision, without legal guide or compass as to its course, in effect does the jury think that the plaintiff does or does not come under the Jones Act. In view of the precise criterion which has been established as the law of this circuit by its own decisions and those of the Supreme Court, the majority opinion can, I think, be made the law of this circuit only by a departure from, and a refusal to follow, those decisions.

Cameron, Circuit Judge, dissented.